Matthew Clarke, Bar No. 022758
LANDYE BENNETT BLUMSTEIN LLP
3600 Wells Fargo Center
1300 SW 5th Avenue
Portland, OR 97201
Telephone: (503) 224-4100
Facsimile: (503) 224-4133
mclarke@lbblawyers.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MARY ALETKY, Individually and as Personal Representative of the Estate of Mark Gregory Aletky,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>Wrongful Death and Negligence; 28 U.S.C. §§ 1346 & 2671 *et seq.* |

COMES NOW the Plaintiff, by and through her undersigned attorneys, and alleges as follows:

**THE PARTIES**

1.      Plaintiff Mary Aletky is the duly appointed, qualified and acting Personal Representative of the Estate of Mark Gregory Aletky, deceased, and is a citizen and resident of

Page 1 - COMPLAINT

the State of California.  Plaintiff is the surviving wife of the deceased, Mark Gregory Aletky.

2.     Defendant United States of America is a body politic organized under the laws of the United States of America, and for purposes of this litigation operates through its executive branch, an agency of government known as the Federal Aviation Administration (FAA), charged with the responsibility under the Federal Aviation Act of 1958, as amended, to ensure the safety of flight and the safe and efficient use of navigable airspace by operation of air traffic control (ATC) facilities and providing ATC services.

## JURISDICTION AND VENUE

3.     This action arises under 28 U.S.C. §§ 1346 & 2671, *et seq.*, known as the Federal Tort Claims Act (FTCA).

4.     Plaintiff has complied with all administrative prerequisites to the institution of suit under the FTCA.

5.     Specifically, the airplane crash in which Mark Gregory Aletky sustained severe personal injuries resulting in his death occurred on April 7, 2017 ("the crash").  Plaintiff timely filed her administrative claim with the FAA on April 1, 2019.  The FAA denied the claim on April 16, 2020.

6.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1346(b) in that the federal district courts have exclusive jurisdiction of all claims against the United States under the FTCA, and under 28 U.S.C. § 1331 in that this case arises under the FTCA, which is a federal statute.

7.     Venue is appropriate in the District of Oregon under 28 U.S.C. § 1402(b) in that the defendant's negligent acts and omissions occurred at the Eugene Air Traffic Control Tower and TRACON, located at the Eugene Airport, Eugene, Oregon in Lane County, and the crash occurred near Harrisburg, Oregon in Linn County.

8.      Divisional venue is appropriate in the Eugene Division because it is the division in which a substantial part of the events or omissions giving rise to the claim occurred.

## COUNT FOR NEGLIGENCE

9.      On April 7, 2017, Plaintiff's decedent, Mark Gregory Aletky, age 67, was piloting a Piper PA 46-310P "Malibu" aircraft, registration N123SB ("the aircraft") with three passengers on a cross-country flight under instrument flight rules (IFR) from Van Nuys Airport, Van Nuys, California to Eugene Airport (Mahlon Sweet Field; EUG), Eugene, Oregon.

10.      ATC services at and around the Eugene Airport are provided by the FAA operating the Eugene Air Traffic Control Tower and TRACON ("Eugene ATC").  Among other sources of weather information, including pilot reports, FAA employees operating Eugene ATC have use of visual displays for precipitation and precipitation intensity in the area around the Eugene Airport via Eugene ATC's Standard Terminal Automation Replacement System (STARS).

11.      Eugene ATC's STARS system utilizes area precipitation radar data to provide Eugene ATC a visual display showing area precipitation and precipitation intensity that provides Eugene ATC with real-time, or near real-time, visual depiction of precipitation, its intensity, its location, and its direction of movement, and all in relation to the position of aircraft which is also displayed.

12.      Although such ATC radar systems display precipitation data, it is known and intended, and FAA air traffic control personnel including Eugene ATC personnel are trained to and expected to understand, that the presence of substantial precipitation, including heavy and extreme precipitation, indicated through STARS and other systems utilized by ATC, correlates with the existence of severe or convective weather with wind shear, severe and extreme turbulence, downdrafts, updrafts, vortices, downbursts, and microbursts, and weather significant

to the safety of aircraft, both within the location of the heavy or extreme precipitation echoes depicted on STARS and in the vicinity of or near the echoes.

13.     These weather phenomena that are known by FAA air traffic controllers, including Eugene ATC personnel, to correlate with, and which do in fact correlate with, heavy and extreme precipitation echoes, including wind shear, severe and extreme turbulence, downdrafts, updrafts, vortices, downbursts, and microbursts, pose a serious threat to aircraft, and could cause and are known to cause aircraft to structurally break apart and crash, to rapidly lose substantial altitude and impact terrain, to aerodynamically stall and impact terrain, and to enter into extreme and dangerous attitudes resulting in structural break up, substantial and unrecoverable loss of altitude, and/or unrecoverable aerodynamic stall.

14.     FAA air traffic controllers, including Eugene ATC personnel, are taught to and do understand that these dangerous weather phenomena are produced by the severe and convective storm cells that correlate with substantial precipitation echoes, including heavy and extreme precipitation, and with weather significant to the safety of aircraft.

15.     It is, therefore, extremely dangerous for aircraft to fly into or close to severe and convective storm cells, which are indicated by substantial precipitation echoes on the STARS display utilized by Eugene ATC, and Eugene ATC personnel are taught to, and do, understand this, and that aircraft must avoid areas of substantial precipitation, including heavy and extreme, depicted on the STARS displays.

16.     The STARS system utilized by Eugene ATC provides precipitation in six levels of intensity:  Level 1 = Light; Level 2 = Moderate; Levels 3 and 4 = Heavy; and Levels 5 and 6 = Extreme.  It is known and understood by ATC personnel, including at Eugene ATC, that heavy and extreme precipitation are correlated with the dangers described above and that it is dangerous for aircraft to fly into them.

17.    Eugene ATC personnel know that echoes showing heavy to extreme precipitation on STARS likely indicates severe and convective storm cells that are extremely dangerous to aircraft as described above, and that those aircraft being vectored by Eugene ATC on an approach pattern at low assigned altitudes are particularly vulnerable to the dangers created by such storm cells.

18.    Eugene ATC's STARS system utilizes weather radar data from Airport Surveillance Radar-9 (ASR-9) and ASR-11 sites around the Eugene airport, whereas the NEXRAD system does not have radar closer than 100 miles to Eugene.

19.    As a result, Eugene ATC's STARS system provides Eugene ATC with low level, rapidly updating, real-time precipitation information, including heavy and extreme precipitation indicative of convective storm cells that are particularly dangerous to aircraft flying at lower altitudes around the Eugene airport, including aircraft landing and flying approach patterns for landing, and departing aircraft, that is not available to the public systems that use NEXRAD, including the systems available to pilots.

20.    The Eugene ATC STARS system can be, and was on the morning of the crash, the only source of accurate information regarding the fact that dangerous storm cells had formed and were intensifying all around the Eugene airport, but this data was only accessible to Eugene ATC who had a duty to accurately relay the danger to the aircraft and to vector the aircraft safely when providing vectors.

21.    When aircraft are flying under IFR in non-clear weather conditions, known as Instrument Meteorological Conditions, they can land at an airport like Eugene Airport using the Instrument Landing System (ILS) that provides both a horizontal pathway and a vertical descent pathway to the runway via a localizer signal and glideslope signal, respectively, displayed on the aircraft's instruments.  At airports like Eugene with radar facilities, pilots rely on vectors from

ATC to safely "steer" them, using both assigned altitudes and altitude changes (descending as the aircraft gets closer to the approach course), and assigned headings and heading changes, to a point where they can intercept the localizer course and utilize the ILS for the runway.

22.     Pilots rely on vectors from ATC, which are assigned headings and altitudes, to safely navigate them to the approach course (ILS) for the runway.  Pilots are not free to deviate from ATC instructions and vectors.

23.     ATC personnel provide vectors to pilots, with assigned headings and altitudes, for purposes that include safety, and ATC personnel have a duty to consider factors that may in any way affect the safety of the flight in providing approach vectors, including heavy or extreme precipitation indicated on their radar screens, which correlate with weather significant to the safety of aircraft.

24.     ATC personnel have a duty not to vector aircraft into areas of heavy and extreme precipitation, which they are taught and understand correlate to weather that is very dangerous to aircraft, including with severe to extreme turbulence, wind shear, updrafts, downdrafts, vortices, microbursts, and downbursts, all of which could cause aircraft to structurally break apart, to rapidly lose substantial altitude and crash into terrain, to aerodynamically stall, and to enter into extreme and dangerous attitudes resulting in structural break up, substantial and unrecoverable loss of altitude, and/or unrecoverable aerodynamic stall.

25.     Mark Gregory Aletky (sometimes referred to as Mark or Mark Aletky) filed an IFR flight plan and departed in the aircraft carrying three passengers from Van Nuys at 7:27 a.m. About three hours later, the aircraft was passing to the east of Glide, Oregon, and getting close to the Eugene area.  Mark reported on frequency with Eugene ATC.  Mark requested vectors for the ILS Runway 16L approach to Eugene Airport.  Eugene ATC acknowledged and told Mark to expect vectors to the Runway 16L ILS.

26.     Runway 16L at Eugene airport is a runway running from north to south parallel to another runway also running north to south to the west – Runway 16R.

27.     During this time, the STARS display indicated to Eugene ATC that there were storm cells to the South, North, East, and West of Eugene Airport that were intensifying and which included areas of heavy and extreme precipitation and which meant that approaches to Eugene Airport could not be safely conducted until the storms cleared areas around Eugene Airport.

28.     Conditions that day were favorable to the potential formation of isolated convective storm cells across a very large area, including the northern half of California, and almost all of Oregon and Washington.

29.     However, there were no specific storms reported around the Eugene area such that Mark would have, or should have, known that there were specific areas of convective activity occurring at or around the Eugene airport.

30.     Instead, most of the area with the potential for convective activity was clear of storms throughout the flight path, and the weather information available to pilots flying in that region, including Mark, would not have put anyone on notice that the Eugene airport was, or was going to be, surrounded by convective storm cells with heavy to extreme precipitation, weather significant to the safety of aircraft, late that morning.

31.     There were, in fact, no weather sources available to and utilized by pilots, including Mark, that would have alerted Mark or any other pilot of an aircraft not equipped with its own weather radar system (as opposed to receiving NEXRAD weather radar data) to the presence of dangerous and intensifying convective storm cells around the Eugene Airport that morning and during the time around the crash.

32.     In fact, the NEXRAD system, which provides the weather radar data that pilots

can access and utilize, did not show that there were dangerous and intensifying convective storm cells around the Eugene Airport because NEXRAD does not have radar closer than 100 miles to the Eugene Airport. Only Eugene ATC knew about these dangerous and intensifying convective storm cells around the Eugene Airport because the STARS system, fed by the local ASR-9 and ASR-11 weather radar sites around Eugene Airport, clearly depicted them in real-time, or near real-time, and rapidly updating.

33.    Though this information, critical to aircraft safety, particularly those flying approach patterns to Eugene Airport, was uniquely known to Eugene ATC as clearly depicted on their STARS display, Eugene ATC failed to warn Mark about the danger as he approached the Eugene airport and was requesting ATC vectors for the Runway 16L ILS. Eugene ATC knew or should have known that aircraft in the Eugene airspace would not know about the dangerous storm cells popping up and rapidly intensifying around Eugene Airport absent Eugene ATC accurately telling them about what the STARS radar display was showing.

34.    As Mark approached the Eugene area from the southeast and transitioned to Eugene ATC airspace at around 10:30 a.m., Mark asked Eugene ATC to provide vectors to the Runway 16L ILS at Eugene Airport. Eugene ATC accepted Mark's request for vectors, and though Eugene ATC's STARS system showed that dangerous and intensifying storm cells had formed all around the Eugene Airport, Eugene ATC only informed Mark of "observed weather in the northeast quadrant" of the Eugene area.

35.    Because of the "observed weather" purportedly only in the northeast quadrant of Eugene, Eugene ATC advised Mark to expect to receive vectors for a "right downwind" approach, which means ATC-issued vectors to intercept the Runway 16L ILS by coming from south to north along the west side of the runway/airport, and when northwest of the runway/airport, making ATC-directed right turns until the aircraft "intercepts" the ILS course,

allowing the aircraft to finish the approach using the ILS.  This directive would have been understood by Mark as a route that ATC was guiding him on to the Runway 16L approach involving the southwest and northwest quadrants, and thus would avoid the vaguely described "observed weather" Eugene ATC told him existed only in the northeast quadrant.

36.    Mark acknowledged the right downwind and stated that he was waiting for Eugene ATC to provide him an assigned heading.  For the next nine minutes, Eugene ATC did not instruct Mark to change his heading as he flew toward heavy precipitation depicted on Eugene ATC's STARS display to the southeast of the Eugene Airport, and Eugene ATC did not otherwise warn Mark of the storm cell he was about to fly into.

37.    At around 10:38 a.m., Eugene ATC instructed Mark to turn right and fly a heading of 330°, then a brief moment later changed the heading to 315° and instructed Mark to descend to 4,000 feet, and then about a minute later again instructed Mark to fly a heading of 330°.

38.    Eugene ATC vectored Mark right into the dangerous storm cell to the southeast of the Eugene Airport and without issuing any warnings of the dangerous weather into which it was vectoring him.  Instead, it was Mark, who at 10:42 a.m. had to tell Eugene ATC that that they had vectored him into heavy precipitation: "we are getting heavy precipitation."

39.    Meanwhile, Eugene ATC had just moments earlier told Mark that, though there was an "area of moderate to heavy precipitation" ten miles ahead, "a lot of the precipitation on the left downwind [approach to the Runway 16L ILS] has dissipated", so to now expect vectors for a left downwind approach.  A "left downwind" approach means ATC-issued vectors to intercept runway 16L ILS by coming from south to north to the east of the runway/airport, and when northeast of the runway/airport, making ATC-directed left turns to the west until the aircraft "intercepts" the ILS course, allowing the aircraft to finish the approach using the ILS.

40.    Eugene ATC's communication that precipitation on the left downwind approach had cleared was not true.  Instead, Eugene ATC's STARS system showed that the left downwind approach was treacherous, with heavy and extreme precipitation correlating to dangerous storm cells.  In fact, STARS indicated that dangerous storm cells were all around Eugene Airport at that time and intensifying, not dissipating, and that the left downwind approach vectors, and the 16L ILS course were in areas of heavy precipitation that was getting worse, not better.  The STARS display showed Eugene ATC that the left downwind was dangerous and becoming increasingly dangerous due to direction of movement of the heavy and extreme precipitation.

41.    Thus, Eugene ATC, which had already negligently failed to warn Mark of the heavy precipitation and dangerous storm cell Eugene ATC had vectored him into to the southeast of the Eugene Airport, also negligently gave Mark the false impression: 1) that the area of moderate to heavy precipitation 10 miles ahead of him was not part of the left downwind approach path vectors Eugene ATC was going to issue; and 2) that left downwind approach path vectors Eugene ATC was going to issue Mark was an approach path clear of any potentially problematic weather or weather significant to the safety of aircraft.

42.    At 10:40:30, Eugene ATC informed Mark that there was an area of moderate to heavy precipitation 10 miles ahead but that "a lot of the precipitation on the left downwind has dissipated" and so to *now* "expect a left downwind for one six left (16L)."  This statement was untrue.  In fact, STARS indicated that storm cells were all around Eugene Airport at that time, and that the left downwind approach vectors, and the 16L ILS course were all in areas of heavy precipitation that was getting worse, not better.  Additionally, STARS clearly showed Eugene ATC that Mark was flying directly into an area of heavy precipitation to the southwest of Eugene Airport, but failed to warn him about it.

43.    When Mark informed Eugene ATC that he was in the heavy precipitation to the

southeast of the Eugene Airport that Eugene ATC had vectored him into and failed to warn him about, Eugene ATC responded by asking Mark if he needed vectors.  Mark, relying on Eugene ATC's representation to him that "the precipitation on the left downwind" to 16L "has dissipated" again asked Eugene ATC to vector him to the Runway 16L ILS.

44.    Eugene ATC again accepted and confirmed left downwind vectors to the Runway 16L ILS despite STARS clearly indicating that the heavy to extreme precipitation on left downwind to 16L had not dissipated, but rather, was intensifying, and knowing that Mark would be flying dangerously close to and through dangerous storm cells, and without: 1) correcting its prior negligent misstatement that precipitation along the left downwind approach path vectors had "dissipated"; and 2) without warning Mark that the left downwind approach path vectors were going to place him directly into heavy to extreme precipitation and, thus, very dangerous storm cells.

45.    As Mark flew through and cleared the first area of dangerous heavy precipitation that Eugene ATC vectored him into without any warning, he continued following Eugene ATC vectors, which included a descent to 2000 feet, a right heading change, and then a left heading change.  By this point Mark was north of Eugene and Junction City and flying in a northerly direction (the left downwind leg of the approach) when Eugene ATC informed him that the precipitation ahead to the north, which was previously 10 miles away, was now three miles away and was heavy to extreme.

46.    As stated earlier, by falsely communicating to Mark that the left downwind approach vectors to the Runway 16L ILS were going to be clear of problematic precipitation, and reconfirming/accepting Mark's request for vectors to the ILS, Eugene ATC had conveyed to Mark that the approach path vectors Eugene ATC would be issuing would not put him on course to enter the area precipitation Eugene ATC had reported to Mark was further ahead to the north,

and instead, the vectors ending the left downwind leg and turning the aircraft to the west to intercept the ILS would be issued before Mark flew the left downwind leg far enough to the north to enter the reported precipitation to the north.

47.     Instead, the reality, unknown to Mark but which should have been obvious to Eugene ATC based on the STARS display, was that the left downwind leg Eugene ATC was vectoring Mark on, and the vectors turning the aircraft to the west to intercept the ILS, were all going to place the aircraft directly into heavy to extreme precipitation and dangerous storm cells.

48.     Though Eugene ATC had multiple opportunities to do so, at no point did Eugene ATC inform Mark that its earlier representation that precipitation along the left downwind approach path vectors for the Runway 16L ILS had dissipated was in fact untrue, and instead, such vectors would place the aircraft squarely into extremely dangerous storm cells and at a very vulnerable low altitude, and Eugene ATC negligently proceeded to vector Mark right into very dangerous storm cells at a very low altitude with a high probability of severe or extreme turbulence, dangerous wind shear, downdrafts, updrafts, downbursts, or microbursts, likely to result in the aircraft crashing due to structural break up, rapid loss of altitude and impact with terrain, or unrecoverable aerodynamic stall at a low altitude.

49.     Mark, unaware of the danger, continued to follow Eugene ATC's negligent left downwind approach vectors and ended the left downwind leg and turned to the west for an interception of the ILS when and as instructed by Eugene ATC as the aircraft reached the north end of Harrisburg, all of which instructions were negligent, if not entirely reckless, in light of danger clearly depicted on Eugene ATC's STARS display.

50.     Eugene ATC's vectors placed the aircraft in the heart of dangerous storm cells and at a low altitude where it was particularly vulnerable to the known, powerful and dangerous unstable airflow patterns associated with such storm cells.  As a result, the aircraft encountered

severe or extreme turbulence and wind shear and a dangerous downburst or microburst that ultimately caused the aircraft to impact terrain in a farm field to the northwest of Harrisburg, just east of the Willamette River.  Mark, and his three passengers, were all killed in the crash.

51.    Eugene ATC did not have a heavy air-traffic management load and did not have a traffic separation workload at the time that would have prevented them, or excused them, from issuing safe vectors, providing accurate weather information, and accurately warning of dangerous heavy and extreme precipitation and storm cells.

52.    A substantial factor in causing the crash and resulting fatal injuries to Mark Gregory Aletky was the negligence of the defendant, United States of America, through the acts and omissions of employees of the Federal Aviation Administration at Eugene ATC acting within the scope of their employment, in one or more of the following particulars:

     a.    Negligently vectoring the aircraft into heavy and extreme precipitation;

     b.    Negligently vectoring the aircraft too close to heavy and extreme precipitation;

     c.    Negligently vectoring the aircraft into dangerous storm cells;

     d.    Negligently vectoring the aircraft too close to dangerous storm cells;

     e.    Negligently vectoring the aircraft into weather significant to the safety of aircraft;

     f.    Failing to provide accurate information to Mark Aletky regarding the heavy and extreme precipitation along the left downwind approach path vectors Eugene ATC was planning to and did issue;

     g.    Failing to provide accurate information to Mark Aletky regarding the dangerous storm cells along the left downwind approach path vectors Eugene ATC was planning to and did issue;

     h.    Failing to provide accurate information to Mark Aletky regarding the heavy and extreme precipitation along the left downwind approach path to the Runway

16L ILS at Eugene Airport;

i.    Failing to provide accurate information to Mark Aletky regarding the dangerous storm cells along the left downwind approach path to the Runway 16L ILS at Eugene Airport;

j.    Inaccurately stating to Mark Alekty that there was "observed weather" only in the northeast quadrant around Eugene Airport, when in fact STARS showed, and Eugene ATC knew or should have known, that dangerous storm cells had formed and were intensifying all around the Eugene Airport;

k.    Vectoring Mark Aletky into heavy precipitation and dangerous storm cell to the southeast of Eugene Airport without warning or informing him of the storm cell or the precipitation echo;

l.    Failing to vector Mark Aletky on a short final ILS intercept that would have avoided the dangerous weather along the ordinary left downwind ILS intercept vectors taking the aircraft further to the north;

m.    Failing to ask Mark Aletky whether he wanted vectors for a visual approach to Runway 16L or vectors for a short final ILS intercept as the only possible left downwind approach at that time that could have avoided the dangerous storm cells along the ordinary left downwind ILS intercept vectors taking the aircraft further to the north;

n.    Communicating to Mark Aletky that precipitation on the left downwind had cleared, when in fact the left downwind approach path had not cleared and instead went right into dangerous and intensifying storm cells shown by heavy and extreme precipitation echoes on Eugene ATC's STARS display;

o.    Failing to state that the precipitation to the north was within the the left downwind approach path vectors Eugene ATC planned to issue and did issue in that the left downwind leg would enter or get dangerously close to entering the precipitation to the north before Eugene would issue vectors turning the aircraft to the west for ILS intercept;

Page 14 - COMPLAINT

      p.      Communicating about precipitation to the north in a manner that gave the false impression it was not along the left downwind approach path vectors Eugene ATC was going to issue in that vectors turning the aircraft to the west for ILS intercept would be issued before the aircraft flew sufficiently to the north to enter the precipitation;

      q.      Failing to recognize that the aircraft could not be safely vectored on a left downwind approach without entering into heavy and extreme precipitation and weather significant to the safety of aircraft, at a low altitude, with the resulting high risk of a crash;

      r.      Failing to warn or inform Mark Aletky that the aircraft could not be safely vectored on a left downwind approach without entering into heavy and extreme precipitation and weather significant to the safety of aircraft, at a low altitude, with the resulting high risk of a crash;

      s.      Failing to issue vectors to Mark Aletky as needed to avoid the aircraft entering into dangerous and intensifying storm cells, including, but not limited to, short final vectors, vectors to an area clear of precipitation and storm activity and holding as needed until the storm cells sufficiently cleared the Eugene Airport area, or vectors to an alternate airport;

      t.      Failing to issue appropriate vectors for safety in violation of FAA Order 7110.65W, Section 5-6-1;

      u.      Failing to provide for safe flow of air traffic in violation of FAA Order 7110.65W, Section 2-1-1; and

      v.      Failing to become sufficiently familiar with the weather information displayed on the STARS system, to solicit and disseminate weather information from pilots, reporting on weather conditions in a grossly inaccurate and misleading manner, and failing to accurately report weather conditions, including all pertinent areas of heavy or extreme precipitation, all pertinent areas of strong storm cells, all pertinent areas of weather significant to the safety of aircraft, and heavy and extreme precipitation, strong

storm cells, and weather significant to the safety of aircraft along the approach path vectors Eugene ATC planned to issue and did issue, in violation of FAA Order 7110.65W, Sections 2-1-2, 2-6-1, 2-6-2, 2-6-3, and 2-6-4.

53.    The foregoing was conduct that unreasonably created a foreseeable risk that the aircraft would crash, resulting in injury to, and the death of Mark Alekty.

54.    The foregoing was also conduct that violated ATC operating procedures, standards, and rules, as set forth in FAA Order 7110.65W, including Sections 2-1-1, 2-1-4, 2-6-1, 2-6-2, 2-6-3, 2-6-4, 5-6-1, and 5-6-2.

55.    As a result of defendant United States of America's negligence through the acts and omissions employees of the Federal Aviation Administration at Eugene ATC acting within the scope of their employment as set forth above and Mark Aletky's resulting injuries and death, Mark Aletky suffered physical and mental pain and suffering, including fear of impending death, and his surviving wife and children have suffered economic and noneconomic damages, including pecuniary loss, loss of society, companionship, and services, pecuniary loss to the decedent's estate, and damages for decedent's pain and suffering in an amount to be proven at trial.

56.    As a further result of the foregoing negligence and death of Mark Aletky, Plaintiff Mary Aletky incurred reasonable and necessary charges for burial and memorial services rendered for the decedent in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendant, United States of America, for economic and noneconomic compensatory damages plus burial and memorial service expenses in amounts to be proven at trial, together with costs, disbursements, and interest, and for such other relief as the Court deems just and equitable.

DATED this 8th day of June 2020.

LANDYE BENNETT BLUMSTEIN LLP

By:  s/ Matthew K. Clarke
       Matthew K. Clarke, OSB #022758
       Attorneys for Plaintiff